## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| IN RE: | |
| | Case No. 15-41732 |
| INTERPHASE CORPORATION | Chapter 7 |
| Debtor | |

## TRUSTEE'S AMENDED OBJECTION TO CLAIM OF
## GREGORY B. KALUSH, PROOF OF CLAIM NO. 14

NO HEARING WILL BE CONDUCTED ON THIS OBJECTION UNLESS A WRITTEN OBJECTION IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AND SERVED UPON THE PARTY FILING THIS PLEADING WITHIN TWENTY-ONE (21) DAYS FROM DATE OF SERVICE UNLESS THE COURT SHORTENS OR EXTENDS THE TIME FOR FILING SUCH OBJECTION. IF NO OBJECTION IS TIMELY SERVED AND FILED, THIS PLEADING SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT. IF AN OBJECTION IS FILED AND SERVED IN A TIMELY MANNER, THE COURT WILL THEREAFTER SET A HEARING. IF YOU FAIL TO APPEAR AT THE HEARING, YOUR OBJECTION MAY BE STRICKEN. THE COURT RESERVES THE RIGHT TO SET A HEARING ON ANY MATTER.

Mark A. Weisbart, Chapter 7 Trustee ("Trustee") in the above-referenced bankruptcy case, files this, his Amended Objection to Proof of Claim of Gregory B. Kalush, Proof of Claim No. 14. In support of this objection, the Trustee would respectfully show the Court the following:

### I. JURISDICTION

1.      This Court has jurisdiction to hear this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and the Order of Reference for the United States District Court for the Eastern District of Texas.

2.      This objection is brought pursuant to Section 502 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 3007 of the Federal Rules of Bankruptcy Procedure. This proceeding constitutes a core matter pursuant to 28 U.S.C. § 157(b)(1)(A) and (B).

3.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### II. PROCEDURAL AND FACTUAL BACKGROUND

4.      On September 30, 2015 (the "Petition Date"), Interphase Corporation (the "Debtor") filed a voluntary petition under Chapter 7 of Title 11 of the United States Code (the

"Bankruptcy Code").  Mark A. Weisbart was thereafter appointed the interim Chapter 7 Trustee, and has continued in the capacity as trustee since the meeting of creditors.

5.     The Debtor was an information and communications technology company providing embedded computing solutions, engineering design services, and contract manufacturing services in North America, the Pacific Rim and Europe.  Prior to the cessation of its operations the Debtor employed approximately eighty (80) employees.

6.     As of the Petition Date, Gregory B. Kalush ("Kalush") was the Debtor's Chief Executive Officer and President, and a member of its Board of Directors.   Kalush signed the Debtor's bankruptcy petition, schedules and statement of financial affairs for, and on behalf of, the Debtor.  In conjunction with the filing its petition, on the Petition Date, the Debtor filed a Form 8-K with the Securities and Exchange Commission (the "Form 8-K") and issued a press release (the "Release") announcing the Debtor's bankruptcy filing.  As disclosed on the Form 8-K, effective as of September 30, 2015, Kalush and all other directors of the company resigned as members of the Board of Directors, and Kalush and all other named officers of the company ceased to be officers and employees of the Debtor effective immediately after the filing of the bankruptcy case. Kalush also resigned from his other positions with the Debtor's subsidiaries.  The Form 8-K further reflects that prior to the case's filing the company's Board of Directors terminated Kalush without cause under his employment agreement effective immediately after the filing.

7.     On or about December 16, 2015, Kalush filed a Proof of Claim asserting an unsecured claim in the amount of $1,058,543.36, which is denoted on the Court's claim register as Claim No. 14-1 (the "Claim").  Of this amount, Kalush asserts that $12,475.00 consists of a priority claim for wages, salaries or commissions pursuant to Section 507(a)(4).  A true and correct copy of the Claim is attached hereto as Exhibit "A".

8.     As filed, the Claim is based on Kalush's entitlement to severance payments and

other compensation or reimbursement arising from a certain Amended and Restated Employment

Agreement effective as of December 30, 2008 (the "Agreement"), between he and the Debtor, and

certain unreimbursed expenses incurred by Kalush in relation to a pending bankruptcy proceeding

in France of Debtor's subsidiary, Interphases SAS.   As identified in the Claim, the amount

purportedly due Kalush is attributable to the following:

| SEVERANCE OBLIGATIONS UNDER AGREEMENT | AMOUNT |
|---|---|
| (a) Section 11 b (ii) – Three (3) years base salary at $325,000 per year (the "Severance") | $975,000.00 |
| (b) Section 11 b (ii) – Eighteen (18) months Health Insurance Coverage (through COBRA if available) - calculation based on similar coverage available through Healthcare.Gov (the "COBRA Premiums") | $34,650.00 |
| (c) Section 14: Outplacement Services – at 15% of executive's base salary of $325,000 (the "Outplacement Reimbursement") | $48,750.00 |
| Unreimbursed copying charges in October 2015 | $143.36 |
| Total Claim Amount: | $1,058,543.36 |

9.    Paragraphs 11(b)(ii) and 14 of the Agreement provide, in pertinent part, as follows:

11 (b)(ii)    Subject to the Executive's execution of a general release of claims and covenant not to sue in a form acceptable to the Corporation (the "Release"), the Executive shall receive severance payments in the amount of three (3) years' base salary, payable in bi-weekly installments over a thirty-six (36) month period at the current effective base salary rate at the time of non-renewal of this agreement . . .

In addition, if the Executive has satisfied the eligibility conditions for severance payments described above, . . . *and in connection with the Executive's termination of employment the Executive is eligible for and timely elects to continue Executive's coverage under the Corporation's group health plan* pursuant to Section 4980B of the Code and Section 601 et seq. of the Employee Retirement Income Security Act of 1974, as amended ("COBRA Coverage") *and to continue the coverage of Executive's dependents who are eligible for COBRA Coverage as a result of Executive's termination of employment* (the "Qualified Beneficiaries"), *the Corporation will pay the premium cost for COBRA Coverage for the Executive and for the Qualified Beneficiaries for the 18-month period* following the Executive's termination of employment or such shorter period during which the Executive (or with respect to any of the Qualified Beneficiaries, such Qualified Beneficiary) continues to be eligible for COBRA Coverage.

. . .

14. *Outplacement Services.* If the Executive is terminated by the Corporation for any reason other than Overt Misconduct, *the Corporation agrees to reimburse the Executive for any reasonable outplacement consulting fees and expenses incurred by the Executive* during the two year period following such termination; *provided that the aggregate amount reimbursed by the Corporation shall not exceed 15% of the Executive's Base Salary in effect immediately prior such termination. . . The Executive shall promptly submit to the Corporation all requests for reimbursement under this Section 14 and provide that such requests are promptly submitted . . .*

### III. OBJECTION TO CLAIM AND REQUESTED RELIEF

10.     Trustee objects to the Motion on several bases.  First, the portion of the Claim for the Severance, COBRA Premiums and the Reimbursement (collectively, the "Severance Claims") are limited to the damage cap for the breach of employment contracts set forth in Section 502(b)(7). Second, the Claim fails to contain sufficient documentation supporting the claimed amount.  Third, to the extent Kalush has received compensation in any form since his termination such amounts should be offset against the amount allowed.

### A.  Damages From Termination of Agreement are Subject to Cap of Section 507(b)(7)

11.     The Severance Claims are objectionable on the basis that they are overstated.  These claims represent damages from the termination of the Agreement, an employment contract, and thus, are capped to one year's compensation under such agreement as provided in Section 502(b)(7).[1]

12.     Under the Agreement, Kalush's annual compensation was $325,000.  As reflected

---

[1] Section 502(b)(7) provides that a claim is allowed except to the extent that if such claim is a claim of an employee for damages resulting from termination of an employment contract, such claim exceeds –

(A) the compensation provided by such contract, without acceleration, for one year following the earlier of—

(i) the date of the filing of the petition; or
(ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus

(B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates.

in the Form 8-K, Interphase's Board of Directors directed Kalush to terminate his performance under the Agreement prior to the commencement of the case. As a consequence, Kalush's damage claim for termination under the Agreement is limited to that compensation under the Agreement for one year after such date. That the Severance represents "severance" pay is of no consequence.[2] As the Severance Claims seek damages in amount in excess of one year's compensation, the amount in excess of such amount must be disallowed.

**B.  The Claim Lacks Sufficient Documentation to Support Certain Claimed Amounts**

13.     The Claim, to the extent based on the COBRA Premiums and the Reimbursement, should be disallowed as Claim contains insufficient documentation evidencing that those amounts are due and owing.

14.     Interphase's obligation for the COBRA Premiums were conditioned on Kalush's eligibility and his timely election to continue coverage through Interphase's group health plan. There is no documentation that evidences that either Kalush was eligible to participate in or that he timely elected to continue health coverage under the company's group health plan for himself or his dependents. As there is no documentation that evidences Interphase's obligation to pay the COBRA Premiums, such amount should be disallowed.

15.     Likewise, Interphase's obligation to make the Reimbursement for reasonable outplacement fees and expenses is expressly conditioned and limited to those fees and expenses "incurred by [Kalush]" for which Kalush was required to promptly submit all requests for reimbursement. Kalush has failed to demonstrate that he incurred any such costs or that he promptly submitted any reimbursement requests. As there is no documentation that Kalush

---

[2]  See, *In re Tex. Wyo. Drilling, Inc.*, 486 B.R. 746, 757-58 (Bankr. N.D. Tex. 2013). See, *In re VeraSun Energy Corp.*, 467 B.R. 757, 765-67 (Bankr. Del. 2012) (unpaid severance benefits subject to 502(b)(7) cap).

incurred such fees and expenses nor that he submitted such costs for reimbursement. Consequently, the claimed Reimbursement should be denied.

## C.  **There is no Basis for the Reimbursement Claimed**

16.     Kalush claims he is due $48,750 for the Reimbursement calculated on a flat 15% of his base salary, $325,000.  Yet, such calculation is neither warranted nor provided for in the Agreement.  Paragraph 14 of the Agreement expressly provides that Interphase agrees to reimburse Kalush for reasonable outplacement service fees and expenses "provided that the aggregate amount reimbursed by the Corporation *shall not exceed 15% of the Executive's Base Salary* in effect immediately prior such termination."  Rather than providing a flat percentage for to be reimburse to Kalush, this language only capped the amount the company agreed to reimburse Kalush for such "reasonable outplacement consulting fees and expenses."

17.     As the Claim's calculation for the Reimbursement is contrary to Agreement's terms and there is no evidence substantiating the reasonableness of any such fees and expense, the claimed Reimbursement should be denied.

## D.  **Offset Against Severance Amounts Allowed**

18.     In the event it is determined that Kalush has received compensation, in any form, since his termination, Trustee seeks an offset of the amount of such compensation to any amount allowed.

19.     Paragraph 11(ii) of the Agreement provides, in part:

> The severance payments will be reduced by any compensation (e.g., base salary, bonus, commission or similar payments) that [Kalush] receives from other employment (including, but not limited to, self employment by [Kalush]) during the three (3) year severance pay period. [Kalush] agrees to keep the Corporation fully informed of such compensation received from other employment.

20.     Under this provision, any severance amount due Kalush should be reduced by the amount of any compensation he has received since his termination from Interphase.

## IV. PRAYER

WHEREFORE, Mark A. Weisbart, the Chapter 7 Trustee, prays that the Court sustain this objection, disallow the Claim as provided above and grant him such further relief as this Court deems fair and equitable.

Respectfully Submitted,

/s/ Mark A. Weisbart
Mark A. Weisbart
Texas Bar No. 21102650
THE LAW OFFICE OF MARK A. WEISBART
12770 Coit Road, Suite 541
Dallas, Texas 75251
(972) 628-4903 Phone
mark@weisbartlaw.net

COUNSEL FOR CHAPTER 7 TRUSTEE

### TRUSTEE'S DECLARATION UNDER LOCAL BANKRUPTCY RULE 3007(a)(2)

I, Mark A. Weisbart, the Chapter 7 Trustee, hereby declare under penalty of perjury that I have read the foregoing Objection to the Proof of Claim and that the factual allegations made in such Objection are true and correct to the best of my knowledge, information and belief.

Date: March 1, 2017                    /s/ Mark A. Weisbart
                                       Mark A. Weisbart

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing instrument was served on the below party as well as the parties listed on the attached mailing list in accordance with LBR 9013(f) either through the Court's electronic notification system as permitted by Appendix 5005 III. E. to the Local Rules of the U.S. Bankruptcy Court for the Eastern District of Texas, or by first class United States Mail, postage prepaid on this, the 1st day of March, 2017, as follows:

Gregory B. Kalush
2402 Danbury Drive
Colleyville, TX  76034

                                       /s/ Mark A. Weisbart
                                       Mark A. Weisbart

Fill in this information to identify the case:

Debtor 1 __Interphase Corporation__

Debtor 2 _____
(Spouse, if filing)

United States Bankruptcy Court for the: Eastern District of Texas  [▼]

Case number __15-41732__

FILED
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF TEXAS

2015 DEC 16 PM 1: 16

BY_____DEPUTY

## Official Form 410

# Proof of Claim

12/15

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to **11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Gregroy B. Kalush
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Gregory B. Kalush
Name

2402 Danbury Drive
Number        Street

Colleyville            TX        76034
City                      State        ZIP Code

Contact phone 214 755-4615

Contact email gbkalush@yahoo.com

Where should payments to the creditor be sent? (if different)

_____
Name

_____
Number        Street

_____
City                      State        ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

Exhibit "A"

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?** $_____ 1,058,543.36 . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

**Contractual Severance Obligations - Employment Agreement**

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Exhibit "A"

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ No

☑ Yes. *Check all that apply:*

                                                       **Amount entitled to priority**

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).     $_____

☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).     $_____

☑ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).     $_____12,475.00

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).     $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).     $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.     $_____

\* Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

**If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.**

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   12/14/2015
                  MM / DD / YYYY

    *Gregory Brian Kalush*
    Signature

**Print the name of the person who is completing and signing this claim:**

Name     Gregory         Brian         Kalush
           First name          Middle name       Last name

Title     **Former Chief Executive Officer and President, Interphase Corporation**

Company     _____
          Identify the corporate servicer as the company if the authorized agent is a servicer.

Address     _____
          Number     Street

    _____
          City           State     ZIP Code

Contact phone     _____     Email _____

Exhibit "A"

## Proof of Claim Detailed Support

### Severance Obligations of Interphase to G.B. Kalush

Severance provision outlined in section 11, 13 & 14 of G.B. Kalush's Employment Agreement

| | | |
|---|---|---|
| Section 11 b (ii): Three (3) years base salary at $325,000 per year: | $ | 975,000.00 |
| Section 11 b (ii): Eighteen (18) months of Health Insurance Coverage (through COBRA if available): | $ | 34,650.00  * |
| Section 14: Outplacement Services: at 15% of executive's base salary of $325,000 per year: | $ | 48,750.00 |
| Total Severance, Health Insurance and Outplacement Services Due executive and being claimed: | $ | 1,058,400.00 |

\* Since COBRA is unavailable this calculation is based upon similar coverage available through
Healthcare.Gov

### Unreimbursed expenses for Interphase and Interphases SAS after September 30, 2015

Cost of FedEx mailings to France attorney's associated with Interphase SAS bankruptcy filings:

| | | |
|---|---|---|
| October 1, 2015 letter originals sent to Arnaud Pedron at TAJ Societe d'Avocats: | $ | 87.41 |
| October 12, 2015 letter originals sent to Arnaud Pedron at TAJ Societe d'Avocats: | $ | 55.95 |
| | $ | 143.36 |

| | | |
|---|---|---|
| **Total claim amount:** | $ | 1,058,543.36 |

Exhibit "A"



[THIS AGREEMENT IS SUBJECT TO ARBITRATION]

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is made and entered into effective as of the **30** day of December, 2008 (the "Effective Date"), by and between Interphase Corporation (the "Corporation") and Gregory B. Kalush (the "Executive").

WHEREAS, the Corporation and the Executive are parties to that certain Employment Agreement dated March 12, 2000, which sets forth the terms and conditions of the Executive's employment with the Corporation (the "2000 Agreement"); and

WHEREAS, the Corporation and the Executive desire to amend and restate the 2000 Agreement on the terms and conditions set forth herein in a manner intended to take into account the provisions of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code");

NOW, THEREFORE, the parties hereto, in consideration of the mutual covenants and promises hereinafter contained, do hereby agree as follows:

1.  *Employment.* The Corporation hereby continues the employment of the Executive in the capacity of President and Chief Executive Officer, and the Executive hereby accepts such continued employment, on the terms and conditions hereinafter set forth.

2.  *Duties.* The Executive's general duties and responsibilities as President and Chief Executive Officer shall be overseeing the general operations of the Corporation. The Executive will also serve as Chairman of the Board, or any such other position to which he is appointed by the Board of Directors of the Corporation.

3.  *Term.* The "initial term" of employment under this Agreement, as amended and restated, shall terminate on March 12, 2009, the end of the current term of the Agreement, subject to the termination provisions in Section 10. After the expiration of the initial term of this amended and restated Agreement, this Agreement and the Executive's employment hereunder, will continue for successive two (2) year terms, unless, as provided in Section 10(a), more than thirty (30) days prior to the expiration of the then current term (*i.e.,*

(d) *Expense Reimbursements*: The Corporation agrees to reimburse the Executive, in accordance with the Corporation's policies regarding reimbursement of business expenses, for the reasonable and necessary business expenses incurred by the Executive in the performance of his duties.

(e) *Office Furnishings*: The Corporation agrees to provide a personal computer and office space and furnishings to the Executive commensurate with the Corporation's decor and culture.

(f) *Executive Benefit Plans*: The Executive shall be allowed to participate, to the extent he may be eligible, in any profit sharing, retirement, insurance or other benefit plan or programs maintained by the Corporation from time to time. The Corporation shall also provide the Executive with the life insurance policy for which the Corporation shall pay the premiums on the Executive's life with a $1M (One Million Dollar) death benefit as in effect as of the Effective Date, payable to the Executive's designated beneficiary.

5. *Indemnification.* The Corporation agrees to provide the Executive with coverage under its Director's and Officer's liability insurance policy. The Corporation also agrees to indemnify and defend the Executive in accordance with the Corporation's Articles of Incorporation and Bylaws. This Section 5 shall survive the expiration of this Agreement.

6. *Health and Corporate Owned Life Insurance.* The Corporation agrees to offer coverage to the Executive under the group health plan maintained by the Corporation from time to time on the same basis as other executives of the Corporation. The Corporation, in its discretion, may apply for and procure in its own name and for its own benefit, life insurance on the life of the Executive in any amount or amounts considered advisable by the Corporation, and the Executive shall submit to any medical or other examination and execute and deliver any application or other instrument in writing, reasonably necessary to effectuate such insurance.

7. *Vacations and Leave.* The Executive shall be entitled to four (4) weeks of paid vacation per year to be accrued in accordance with the Corporation's vacation policy in effect from time to time and ten (10) sick days per year, and any other paid leave benefits provided for in the Corporation's Policy Guide.

8. *Non-Disclosure of Confidential Information.* During the term of the Executive's employment, the Corporation has and promises to continue to provide the Executive, and he will be making use of, acquiring, and/or adding to, confidential information of a special and unique nature and value relating to such matters as the patents, copyrights, proprietary information, trade secrets, systems, product developments, procedures, manuals, confidential reports, lists of customers (which are deemed for all purposes confidential and proprietary) of the Corporation and its Affiliates (an "Affiliate" of the Corporation being defined as any person controlling, controlled by, or under common control with the Corporation), as well as the nature and type of services rendered by the Corporation and its Affiliates, the equipment and methods used and preferred by the customers of the Corporation and its Affiliates, and the fees paid by them. The

(i) engage, as an owner, employer, consultant or otherwise, in any business or activity that is competitive with the business of the Interphase Group; and/or (ii) be employed by, or provide competitive services or assistance to, a Competing Business (as hereinafter defined) which would potentially involve, directly or indirectly, the use and/or disclosure of Confidential Trade Secret Information, as defined in Section 8. For purposes of this Section 9, the "Restricted Territory" shall mean North America, Europe, Japan, Korea, Australia, Thailand, China, Singapore and India. For purposes of this Section 9, a "Competing Business" means any person or firm that offers services or products that are directly competitive with those marketed, offered for sale and/or under any stage of development by the Interphase Group, or any member thereof, as of the date of the Executive's separation from employment with the Corporation. If the Executive desires to work for a Competing Business in an area that is not competitive with the business of the Interphase Group, the Executive must give written notice to the Board of Directors of the Corporation and obtain its approval that the employment will not violate the terms and conditions of this Section before beginning employment with the Competing Business.

(c)     The Executive shall not, directly or indirectly, solicit or attempt to solicit the existing or prospective customers of the Interphase Group to purchase services or products that are competitive with those marketed, offered for sale and/or under any stage of development by the Interphase Group as of the date of the Executive's separation from employment with the Corporation. For purposes of this Agreement, existing customers shall mean those persons or firms to whom the Interphase Group, or any member thereof, has made a sale in the preceding twelve (12) months prior to the Executive's separation from employment; prospective customers shall mean those persons or firms that the Interphase Group, or any member thereof, has solicited to purchase, and/or with whom the Interphase Group, or any member thereof, has negotiated to sell, the products or services of the Interphase Group within the preceding twelve (12) months prior to the Executive's separation from employment.

(d)     In the event that, notwithstanding the foregoing, any of the provisions of this Section 9 shall be held to be invalid or unenforceable, the remaining provisions thereof shall nevertheless continue to be valid and enforceable as though the invalid or unenforceable provisions had not been included therein. In the event that any provision of this Section relating to the time period and/or the areas of restriction and/or related aspects shall be declared by a court of competent jurisdiction to exceed the maximum restrictiveness such court deems reasonable and enforceable, the time period and/or areas of restriction and/or related aspects deemed reasonable and enforceable by the court shall become and thereafter be the maximum restriction in such regard, and the restriction shall remain enforceable to the fullest extent deemed reasonable by such court.

(e)     The Executive agrees (i) that the remedy at law for any breach or threatened breach of this Section 9 is inadequate and (ii) that, in the event of breach or threatened breach of this Section 9, the Corporation shall be entitled to injunctive

turpitude, or (iv) a breach by the Executive of either or both of Sections 8 or 9 of this Agreement, or (v) the Executive's intentional violation of reasonable written instructions or policies established by the Corporation's Board of Directors with respect to the operation of the Corporation's business and affairs, or the Executive's failure to carry out reasonable written instructions or policies of the Board of Directors, or a material breach (other than a breach of Sections 8 or 9) by the Executive of this Agreement, provided that before a termination of the Executive pursuant to this subsection 10(e)(v) shall be considered for "Overt Misconduct," the Corporation's Board of Directors must give the Executive written notice and fifteen (15) days to cure such violation or failure. In the event the Corporation asserts that the Executive has committed an act of Overt Misconduct, the termination notice must specify in detail the misconduct alleged, and the witnesses or other basis for such allegation.

(f)     *Notice of Termination.* Notice of termination shall be communicated by dated, written "Notice of Termination" sent by Registered Mail, signed receipt requested.

11.     *Payments Upon Termination.* Payments to the Executive upon termination of employment ("Termination Payments") shall be as follows:

(a)     *Upon Resignation by the Executive.* In the event of a resignation by the Executive, the Executive shall be entitled (i) to his earned, but unpaid, base salary through his last date of employment and to compensation for any accrued, but unused vacation as of the date of his resignation, payable, in each case, in accordance with the Corporation's normal payroll practices, (ii) to exercise vested stock options that are outstanding at the time of the Executive's termination in accordance with the terms of the Executive's stock option grant agreements, and (iii) to any unpaid expense reimbursements for expenses incurred prior to his resignation, subject to the provisions of Section 21. The Executive's election not to renew this Agreement as described in Section 10(a) shall be deemed for purposes of this Section 11 to be a "resignation" by the Executive.

(b)     *Upon Non-Renewal of the Executive's Employment Agreement by the Corporation or Termination by the Corporation for other than Overt Misconduct.* In the event that the Corporation (A) elects not to renew this Agreement and at the time of such non-renewal election by the Corporation, the Executive is willing and able to execute a new agreement containing terms and conditions substantially similar to those in this Agreement and to continue to provide services to the Corporation substantially similar to the services provided at the time the Corporation elects not to renew, or (B) terminates the Executive for other than Overt Misconduct (or death or Disability), then the Executive shall be entitled to the following termination payments and benefits:

(i)     The Executive shall receive his earned, but unpaid, base salary through his last date of employment and compensation for any accrued, but unused vacation as of the date of termination (or non-renewal) payable, in each

but not limited to, self employment by the Executive) during the three (3) year severance pay period. The Executive agrees to keep the Corporation fully informed of such compensation received from other employment.

(iii)    The exercise period of the Executive's vested stock options (whether such options are nonqualified stock options or incentive stock options described in Section 422 of the Code) that are outstanding on the date of the Executive's termination of employment (or the date of non-renewal of this Agreement under this Section 11(b)) and were granted to the Executive as a result of the Executive's employment under this Agreement or the 2000 Agreement and specifically excluding any stock options granted to the Executive as a result of his service as a member of the Corporation's Board of Directors (the "Outstanding Stock Options") shall be extended for a period equal to the shorter of (A) three (3) years or (B) the earlier of the latest date upon which the stock option could have expired by its original terms under any circumstances or the 10th anniversary of the original date of grant of the stock option; provided, however, that for each of Executive's vested stock options, if on the date of the Executive's termination of employment (or the date of non-renewal of this Agreement under this Section 11(b)), the exercise price of the vested stock option is greater than the fair market value of the underlying stock determined on the same date, the Executive's vested stock option shall be cancelled (in lieu of the extension of the exercise period described above) and the Corporation will grant to the Executive a new nonqualified stock option under substantially similar terms and conditions as the cancelled option and with respect to the same number of vested shares at the same exercise price but exercisable for a term of three (3) years.

(c)    *Upon Disability of the Executive.* In the event of termination of the Executive's employment by reason of Disability, the Executive shall be entitled to the following termination payments and benefits:

(i)    The Executive shall receive his earned, but unpaid, base salary through his last date of employment and compensation for any accrued, but unused vacation as of the date of termination for disability payable, in each case, in accordance with the Corporation's normal payroll practices. The Executive shall also be entitled to payment of any unpaid expense reimbursements for expenses incurred prior to the termination of his employment for disability, subject to the provisions of Section 4(d).

(ii)    Subject to the Executive's execution of the Release, the Executive shall receive severance payments in the amount of two (2) years' base salary, payable in bi-weekly installments over a thirty-six (36) month period commencing, subject to the payment timing provisions of Section 19(b), on the first payroll period of the Corporation following the termination of Executive's employment at the current base salary rate as of the date of the termination of Executive's employment for Disability, provided the

termination, provided the Executive has executed and delivered the Release to the Corporation prior to such date (and not revoked the Release during the applicable revocation period). The form of the Release will be provided to the Executive not later than five (5) days following the date of Executive's termination. For this purpose, the annual bonus amount will be the greater of the prior fiscal year's Executive Bonus Plan payment or 100% of the Executive's Bonus Plan target for the year in which his employment terminates.

(iv)    The exercise period of the Executive's vested stock options (whether such options are nonqualified stock options or incentive stock options described in Section 422 of the Code) that are outstanding on the date of the Executive's termination of employment and were granted to the Executive as a result of the Executive's employment under this Agreement or the 2000 Agreement and specifically excluding any stock options granted to the Executive as a result of his service as a member of the Corporation's Board of Directors shall be extended for a period equal to the shorter of (A) three (3) years or (B) the earlier of the latest date upon which the stock option could have expired by its original terms under any circumstances or the 10th anniversary of the original date of grant of the stock option; provided, however, that for each of Executive's vested stock options, if on the date of the Executive's termination of employment, the exercise price of the vested stock option is greater than the fair market value of the underlying stock determined on the same date, the Executive's vested stock option shall be cancelled (in lieu of the extension of the exercise period described above) and the Corporation will grant to the Executive a new nonqualified stock option under substantially similar terms and conditions as the cancelled option and with respect to the same number of vested shares at the same exercise price but exercisable for a term of three (3) years.

(d)    *Upon Death.* In the event the Executive's employment is terminated by reason of his death, the Executive's estate shall be entitled:

(i)     To the Executive's earned, but unpaid base salary through his last date of employment and payment for any accrued, but unused vacation as of the date of termination for death, payable, in each case, in accordance with normal payroll practices of the Corporation.

(ii)    To payment of any unpaid expense reimbursements for expenses incurred prior to the Executive's termination for death, subject to the provisions of Section 21.

(iii)   The exercise period of the Executive's vested stock options (whether such options are nonqualified stock options or incentive stock options described in Section 422 of the Code) that are outstanding on the date of the Executive's death and were granted to the Executive as a result of the

under this Agreement or the 2000 Agreement and specifically excluding any stock options granted to the Executive as a result of his service as a member of the Corporation's Board of Directors shall be extended for a period equal to the shorter of (A) three (3) years or (B) the earlier of the latest date upon which the stock option could have expired by its original terms under any circumstances or the 10th anniversary of the original date of grant of the stock option; provided, however, that for each of Executive's vested stock options, if on the date of the acquisition, the exercise price of the vested stock option is greater than the fair market value of the underlying stock determined on the same date, the Executive's vested stock option shall be cancelled (in lieu of the extension of the exercise period described above) and the Corporation will grant to the Executive a new nonqualified stock option under substantially similar terms and conditions as the cancelled option and with respect to the same number of vested shares at the same exercise price but exercisable for a term of three (3) years.

13.   *Tax Gross Up Payment.*

    (a)    *Excess Parachute Payment.* If the Executive incurs the excise tax (the "Excise Tax") imposed by Section 4999 of the Code on "excess parachute payments" within the meaning of Section 280G(b)(1) of the Code as the result of the receipt of any payments under this Agreement, the Corporation shall pay to the Executive a gross up payment (the "Gross Up Payment") such that the net amount retained by the Executive, after deduction of (i) any such Excise Tax upon any payments under this Agreement (other than payments provided by Section 11 and this Section 13) and (ii) any federal, state and local income and employment taxes (together with penalties and interest) and Excise Tax upon the payments provided by this Section 13 shall be equal to the amount of the payments that the Executive is entitled to receive under this Agreement (other than payments provided by this Section 13).

    (b)    *Applicable Rates.* For purposes of determining the Gross Up Payment amount, the Executive shall be deemed:

        (i)    to pay federal income taxes at the highest marginal rate of federal income taxation applicable to individual taxpayers in the calendar year in which the Gross Up Payment is made (which rate shall be adjusted as necessary to take into account the effect of any reduction in deductions, exemptions or credits otherwise available to the Executive had the Gross Up Payment not been received);

        (ii)    to pay additional employment taxes as a result of the receipt of the Gross Up Payment in an amount equal to the highest marginal rate of employment taxes applicable to wages; provided that if any employment tax is applied only up to a specified maximum amount of wages, such limit shall be taken into account for purposes of such calculation; and

        (iii)    to pay state and local income taxes at the highest marginal rates of taxation in the state and locality of the Executive's residence on the date

        (2)    the exercise price per share of stock subject to such Options; and

    (v)   for purposes of applying the rules set forth in Treasury Regulation Section 1.280G-1, Q&A 24(c) to a payment described in Treasury Regulation Section 1.280G-1, Q&A 24(b), the amount reflecting the lapse of the obligation to continue performing services shall be equal to the minimum amount allowed for such payment as set forth in Treasury Regulation Section 1.280G-1, Q&A 24(c).

(d)    *Time For Payment.*  The Corporation shall pay the Gross Up Payment within thirty (30) days following the date the Executive provides the Corporation with written notice of the Executive's payment of the taxes to which the Excise Tax relates, along with a copy of the return or returns filed by the Executive reflecting remittance of such taxes, but in no event later than by the end of the Executive's taxable year next following the taxable year in which the Executive remits the related taxes.

14.    *Outplacement Services.*  If the Executive is terminated by the Corporation for any reason other than Overt Misconduct, the Corporation agrees to reimburse the Executive for any reasonable outplacement consulting fees and expenses incurred by the Executive during the two year period following such termination; provided that the aggregate amount reimbursed by the Corporation shall not exceed 15% of the Executive's Base Salary in effect immediately prior such termination.  In addition and as to each reimbursement payment, to the extent that any reimbursement under this Section 14 is not deductible by the Executive for federal, state and local income tax purposes, Corporation shall pay the Executive an additional amount such that the net amount retained by the Executive, after deduction of any federal, state and local income tax on the reimbursement and such additional amount, shall be equal to the reimbursement payment.  The Executive shall promptly submit to the Corporation all requests for reimbursement under this Section 14 and provide that such requests are promptly submitted, all amounts payable under this Section 14 shall be paid by Corporation within fifteen (15) days after the Executive's presentation to Corporation of any statements of such reimbursement amounts; provided, however, that (i) reimbursement for reasonable outplacement consulting fees and expenses shall be made no later than the last day of the third taxable year of the Executive following the taxable year of the Executive in which the Executive's termination of employment occurred and (ii) the tax gross up payment provided for in this Section 14 shall be made by the end of the Executive's taxable year next following the Executive's taxable year in which the Executive remits the related taxes.

15.    *Withholding.*  All payments required to be made to the Executive by Corporation shall be subject to the withholding of such amounts, if any, relating to federal, state and local taxes as may be required by law.

16.    *Arbitration.*  Any dispute, controversy or claim arising out of or relating to this Agreement, or breach thereof, except for requests for injunctive relief, specific performance and declaratory relief shall be settled by the following arbitration procedure:

to separation pay plans) or Treasury Regulation Section 1.409A-1(b)(4) (relating to short-term deferrals, for all amounts payable under the schedule prior to March 15 of the calendar year following the calendar year in which the Executive is terminated by the Corporation pursuant to Section 11(b)). However, to the extent any such payments are treated as "non-qualified deferred compensation" subject to Section 409A of the Code, and if the Executive is deemed at the time of his Separation from Service to be a "specified employee" for purposes of Section 409A(a)(2)(B)(i) of the Code, then to the extent delayed commencement of any portion of the benefits to which the Executive is entitled under this Agreement is required in order to avoid a prohibited payment under Section 409A(a)(2)(B)(i) of the Code, such portion of the Executive's termination benefits shall not be provided to the Executive prior to the earlier of (i) the expiration of the six-month period measured from the date of the Executive's Separation from Service or (ii) the date of the Executive's death. Upon the earlier of such dates, all payments deferred pursuant to this Section 19(b) shall be paid in a lump sum to the Executive. The determination of whether the Executive is a "specified employee" for purposes of Section 409A(a)(2)(B)(i) of the Code as of the time of his Separation from Service shall be made by the Corporation in accordance with the terms of Section 409A of the Code and applicable guidance thereunder (including without limitation Treasury Regulation Section 1.409A-1(i) and any successor provision thereto).

20. *Section 409A; Separate Payments.* This Agreement is intended to be written, administered, interpreted and construed in a manner such that no payment or benefits provided under the Agreement become subject to (a) the gross income inclusion set forth within Section 409A(a)(1)(A) of the Code or (b) the interest and additional tax set forth within Section 409A(a)(1)(B) of the Code (collectively, "Section 409A Penalties"), including, where appropriate, the construction of defined terms to have meanings that would not cause the imposition of Section 409A Penalties. In no event shall the Corporation be required to provide a tax gross-up payment to the Executive or otherwise reimburse the Executive with respect to Section 409A Penalties. For purposes of Section 409A of the Code (including, without limitation, for purposes of Treasury Regulation Section 1.409A-2(b)(2)(iii)), each payment that the Executive may be eligible to receive under this Agreement shall be treated as a separate and distinct payment and shall not collectively be treated as a single payment. The Executive acknowledges and understands that neither the Corporation nor any employee or agent of the Corporation has provided the Executive any tax advice regarding this Agreement or amounts payable under this Agreement and that the Corporation has urged the Executive to seek advice from the Executive's own tax advisor regarding the tax consequences of this Agreement to the Executive.

21. *In-kind Benefits and Reimbursements.* Notwithstanding any thing to the contrary in this Agreement, in-kind benefits and reimbursements provided under this Agreement during any tax year of the Executive shall not affect in-kind benefits or reimbursements to be provided in any other tax year of the Executive and are not subject to liquidation or exchange for another benefit. Notwithstanding any thing to the contrary in this Agreement, reimbursement requests must be timely submitted by the Executive and, if

the 2000 Agreement. Notwithstanding the above, any stock option agreements existing between the Corporation and the Executive as of the date of this Agreement shall not be superseded by this Agreement except as specifically provided otherwise in this Agreement.

30. *Burden and Benefit.* This Agreement shall be binding upon, and shall inure to the benefit of, the Corporation and the Executive, and their respective heirs, personal and legal representatives, successors, and assigns.

31. *References to Gender and Number Terms.* In construing this Agreement, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place which the context so requires.

32. *Headings.* The various headings in this Agreement are inserted for convenience only and are not part of this Agreement.

**[*Remainder of page intentionally left blank*]**

**FedEx Office.**

5615 COLLEYVILLE BLVD
Colleyville, TX 76034

Location:          MWLK
Device ID:         MWLK-POS2
Employee:          2271945
Transaction:       860151071952

INTL PRIORITY
806756376071       0.15 lb (S)          55.95


Shipment subtotal:                       55.95


Total Due:                               55.95

(V) CreditCard:                          55.95
***********3168


W = Weight entered manually
S = Weight read from scale
T = Taxable item

Subject to additional charges. See FedEx Service Guide
at fedex.com for details. All merchandise sales final.


Visit us at: fedex.com
Or call 1.800.GoFedEx
1.800.463.3339

October 12, 2015 10:54:56 AM


********** WE LISTEN **********
Tell us how we're doing
& receive a discount on your next order!
fedex.com/welisten or 800-398-0242
Redemption Code: _____

*** Thank you ***

Exhibit "A"

---

*Handwritten shipping form (FedEx International Air Waybill):*

Name: [illegible]
Company: ARNAUD PEDRON
Address: 181 avenue Charles de Gaulle
City: NEUILLY SUR SEINE
State/Province: CEDEX
Country: FRANCE
ZIP/Postal Code: 92524

Total Packages: 1
Total Weight: .15 lbs
Total Declared Value: USD 1.00
Total Value for Customs: 1.00 USD

Commodity Description: Documents

FedEx Tracking Number: 8067 5637 6071

Form ID No: 0402    560    06/14

S COPY FOR YOUR RECORDS.

**FedEx Office**

5615 COLLEYVILLE BLVD
Colleyville, TX 76034

Location:        MWLK
Device ID:       MWLK-POS2
Employee:        2628675
Transaction:     860149060624

_____

INTL PRIORITY
806756375936    0.80 lb (S)    87.41

Shipment subtotal:              87.41

Total Due:              87.41

(V) CreditCard:              87.41
***********3168

M = Weight entered manually
S = Weight read from scale
T = Taxable item

Subject to additional charges. See FedEx Service Guide
at fedex.com for details. All merchandise sales final.

Visit us at: fedex.com
Or call 1.800.GoFedEx
1.800.463.3339

October 1, 2015 2:38:11 PM

_____

********** WE LISTEN **********
Tell us how we're doing
& receive a discount on your next order!
fedex.com/welisten or 800-398-0242
Redemption Code: _____

*** Thank you ***

---

## FedEx International Air Waybill

**Express**

**1 From** Please print and press hard.

Date 10-1-15

Sender's Name GREGORY KALUSH  Phone 214 755 4615

Company INTERPHASE CORPORATION

Address 2402 DANBURY DRIVE

City COLLEYVILLE  State/Province TX  ZIP/Postal Code 76034

Country USA

**2 To**

Recipient's Name ARNAUD PEDRON  Phone

Company TAJ Société d'Avocats

Address 181 avenue Charles de Gaulle

92524 NEUILLY SUR SEINE CEDEX

**4 Express Package Service**
- [X] FedEx Intl. Priority
- [ ] FedEx Intl. First

**5 Packaging**
- [ ] FedEx Envelope
- [X] FedEx Pak
- [ ] Other

**6 Special Handling**
- [ ] HOLD at FedEx Location
- [ ] SATURDAY Delivery

**7 Payment**
- [X] Sender
- [ ] Recipient
- [ ] Third Party
- [ ] Credit Card
- [ ] Cash/Check

RETAIN THIS COPY FOR YOUR RECORDS

Exhibit "A"